# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL No. 2:20-cr-00227 |
| STEVEN PENNYCOOKE | : | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL No. 2:20-cr-00228 |
| SHAWN COLLINS | : | |

## MEMORANDUM OPINION

**GALLAGHER, J.**          **July 15, 2021**

Society expects its police officers to look further when they see something suspicious. This the law has long recognized. When an officer reasonably suspects that criminal behavior is afoot, it would be "poor police work indeed for an officer . . . to have failed to investigate this behavior further." *Terry v. Ohio*, 392 U.S. 1, 23 (1968).

Such reasonable suspicion was aroused on June 2, 2020, when two City of Philadelphia police officers, working during a citywide curfew imposed due to ongoing rioting and civil unrest in the city, responded to a report of two men stealing an ATM. Upon arriving at the location reported by the caller, the officers encountered Defendants Steven Pennycooke and Shawn Collins who were together on an otherwise empty street, standing a short distance away from an unattended ATM in a shopping cart. One officer immediately witnessed Pennycooke

attempt to conceal a handgun by tossing it into a parked automobile. After seizing and frisking both defendants, the officers also found a second handgun on Collins.

The defendants were subsequently arrested and charged with one count each of knowing possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). In their present motions before the Court, the defendants move to suppress the two loaded firearms that were allegedly in their possession at the time of their arrest. For the reasons set forth in greater detail below, the motions are denied.

I. **FACTUAL BACKGROUND**[1]

Late at night on June 2, 2020, Officers Edwin Perez and Arcenio Perez were in the middle of a twelve-hour shift, when they received a report of two individuals loading an ATM onto a cart on a street in Philadelphia. Docket No. 20-cr-0227, ECF No. 44, at 14 (suppression hearing transcript). This was one week after George Floyd had been murdered, and there had been protests and civil unrest throughout the city in the days that followed. *Id.* at 12. In response, the mayor instituted mandatory, citywide curfews, limiting the hours that people could be out in public. *Id.* at 12–13.

Such a curfew was in effect on the night of June 2.[2] *Id.* at 13. Around 10:55 p.m., the officers were driving in their marked police car on their way to the scene of a reported burglary. *Id.* at 14–15. That was when the radio call came through concerning the two individuals and the ATM.[3] *Id.* at 15–16. The location of the ATM incident—the 4100 block of Viola Street—was

---

[1] The Court made the following factual findings based on the credible testimony of Officer Edwin Perez and Officer Arcenio Perez, along with the admitted exhibits, at the suppression hearing held on April 26, 2021.

[2] The curfew prohibited individuals from traveling within the city from 8:30 p.m. on June 2 until 6:00 a.m. the next morning, with limited exceptions. *See* DECLARATION OF EMERGENCY RELATED IMMINENT DANGER OF CIVIL DISTURBANCE, DISORDER, OR RIOT IN PHILADELPHIA ORDER NO. 4 (June 2, 2020), https://www.phila.gov/media/20200606072513/Curfew-Order-6-2-20.pdf (mayor's curfew order).

[3] The call described the individuals as two black males, with one wearing a black sweatshirt, and the other with a

2

only two blocks away from the officers, so they opted to prioritize that call and headed in that direction. *Id.* at 63. About a minute later, the officers were driving down Viola Street approaching the 4100 block. *Id.* at 64. The officers observed either an ATM or a safe on a cart, in the middle of the street, partially covered by a tarp. *Id.* at 17, 63. Standing seventy-five to a hundred feet away from the ATM were the defendants on the sidewalk; no one else was seen in the vicinity. *Id.* at 20.

The officers pulled their car next to the defendants and rolled down the windows. *Id.* at 64–65. Edwin Perez, who was still seated in the driver's seat, asked the defendants, "[W]hat's going on with this safe on the street?" *Id.* at 65. Pennycooke responded by denying any knowledge of the safe.[4] *Id.* As he was responding, Pennycooke moved closer to the rear passenger side of a nearby car. *Id.* He then looked down the street toward the safe, removed a heavy object from his waistband, tossed it into the backseat of the nearby car, and closed the car door. *Id.* at 65, 71. Immediately, Edwin Perez informs his partner that Pennycooke threw a gun into the backseat of the car.[5] *Id.* at 65.

The officers then exited their vehicle with their weapons drawn and ordered the defendants to show their hands. *Id.* at 19. In response, Pennycooke raised his hands and locked the car door with the key fob, which he was holding in his hand. *Id.* at 65. Edwin Perez directed Pennycooke to "drop the key." *Id.* Pennycooke complied, and Edwin Perez put Pennycooke

---

white shirt over his head; no weapons were indicated. *Id.* at 16. Because the caller did not leave any identification information, the report was considered "unverified." *Id.* at 49.

[4] While Edwin Perez was questioning Pennycooke about the safe, Arcenio Perez observed Collins acting suspiciously. He described Collins as "blading his body away and trying to hide behind Pennycooke," even though Collins was larger than Pennycooke. *Id.* at 18–19.

[5] Using his experience, he "just knew [the object] was a gun." *Id.* at 71. Edwin Perez is a seven-year veteran patrol officer, and he estimated that he makes twenty-five gun arrests in a year. *Id.* at 58–59.

against a nearby wall and waited for backup. *Id.* When the first backup officer arrived a short time later, the backup officer escorted Pennycooke to the police car. *Id.* at 66. That is when Edwin Perez looked through the window of the nearby car, and in "plain view," he observed a handgun. *Id.* Before recovering the weapon, Edwin Perez waited until he had permission from his supervisor to open the car door. *See id.* at 75.

At the same time, Arcenio Perez ordered Collins to place his hands on the nearby wall. *Id.* at 19. Despite this directive, Collins, who was holding a cigarette, continued to drop his hands towards his waistband, stating that he was trying to put out the cigarette. *Id.* Arcenio Perez then pushed Collins's hands against the wall and frisked him. *Id.* He found a firearm in Collins's waistband, near where he had previously been reaching. *Id.* Arcenio Perez safeguarded the firearm and handcuffed Collins.[6] *Id.*

The officers thereafter confirmed that neither of the defendants had a firearm license. *See id.* at 72, 111. The defendants were subsequently charged with one count each of illegally possessing a firearm: Pennycooke for the gun recovered from the backseat of the nearby car, and Collins for the gun recovered from his waistband.[7]

---

[6] Portions of the encounter between the officers and the defendants were captured on the officers' body-worn cameras, and the government entered the footage into evidence at the suppression hearing. However, neither officer had initially turned on his camera, meaning the only footage that was captured was at the end of the encounter. The officers explained that their cameras had a battery life of eight hours, so in an effort to preserve the battery on long shifts, the officers would switch them off until they were needed. *Id.* at 23–24. Officer Arcenio Perez testified that he thought his camera was on, but it was not until after Collins was detained that he realized the camera was off. *Id.* at 24.

[7] Pennycooke also chose to testify at the suppression hearing; however, his testimony was not entirely credible. According to Pennycooke, he had just gotten off of work on the night of June 2nd, stopped by his mother's house, and then went to a friend's house on 42nd Street and Viola. *Id.* at 117. While at his friend's house, Pennycooke wanted to smoke a cigarette, but his friend does not allow smoking indoors. *Id.* at 117–18. So, he stepped outside to grab his cigarettes from the car and then have a smoke. *Id.* at 118. As he was getting the cigarettes from the car, a police car stopped by him, and Officer Edwin Perez asked, "what's that up the street?" *Id.* Pennycooke was not aware of the ATM and informed the officer to that effect. *Id.* at 119. Pennycooke then looked down the street in the direction of the ATM, and when he turned back, the officers were out of the car with their guns drawn. *Id.* Officer Edwin Perez then patted him down, took his keys out of his pocket, and then handcuffed him. *Id.* at 120. The officer then searched Pennycooke's car, removed the gun out of the backseat, and then put the gun on the trunk. *Id.* Before additional officers arrived, Edwin Perez then placed the gun back in the car. *Id.* Pennycooke denied tossing a gun

## II. LEGAL STANDARD

Both defendants have now moved to suppress the evidence of the recovered guns. Defendants generally bear the burden of demonstrating that evidence should be suppressed. *United States v. Johnson*, 63 F.3d 242, 245 (3d. Cir. 1995). However, where, such as here, "the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* To satisfy this burden, the government must "establish by a preponderance of the evidence when the seizure occurred and that it was then supported by reasonable suspicion." *United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015).

## III. DISCUSSION

The defendants' challenge the legality of officers' actions on the night of June 2nd. Pennycooke contends that Edwin Perez lacked both reasonable suspicion to seize him and probable cause to arrest him in violation of the Fourth Amendment. Similarly, Collins argues that Arcenio Perez did not have reasonable suspicion to seize him. As such, the defendants maintain that the evidence of the guns obtained from those seizures must be suppressed. After careful review of the evidence submitted and the parties' arguments, the Court concludes that the seizures and arrests of the defendants comported with the requirements of the Fourth Amendment.

---

into the backseat of the car. *Id.* at 130. In fact, he testified at the hearing that the gun was not his and that he had not seen it in the backseat. *Id.* at 131–32. Otherwise, he would not have taken the car that night. *Id.* at 132. Considering the body-camera footage, the timing of the backup officer's arrival, and the officers' testimony, Pennycooke's account is less credible than that of the government.

Furthermore, when questioned about the presence of Collins, who is his brother, that night, Pennycooke testified that he was not aware Collins was standing next to him on the street until after the police arrived. *Id.* at 134, 137. He explained that it was common for both of them to be in the area, as their mutual friend lives nearby. *Id.* at 134–35. He claims that he did not notice Collins until he was getting arrested. *Id.* at 137. This assertion does not appear to align with the body-camera footage that was captured that night. On video, Pennycooke stated that he and Collins had just come out of the house. When faced with this apparent contradiction, Pennycooke reasoned that he had meant in general sense that Collins had just come from somewhere, such as his mother's house. *Id.* at 142.

### A. There was reasonable suspicion to seize Pennycooke.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018). A long-recognized exception permits police officers to "conduct a brief, investigatory stop [without a warrant] when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Lowe*, 791 F.3d at 430 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). As part of the investigatory stop, police officers may also "protective[ly] frisk" a suspect if there is "reason to believe that the suspect may pose a danger to the officers." *Id.* (citing to *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). When evaluating the constitutionality of the investigatory stop, courts must first identify "the moment of the seizure," and then determine "whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity." *Id.* (quoting *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)).

It is undisputed that Pennycooke was seized at the moment he complied with the officers' orders to show his hands. *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) ("A seizure occurs when there is . . . submission to 'a show of authority.'" (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). The parties, however, disagree over whether there was reasonable suspicion to justify that seizure.

Reasonable suspicion is defined as "a particularized and objective basis for suspecting criminal activity based on the totality of the circumstances." *United States v. Torres*, 961 F.3d 618, 623 (3d Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Green*, 897 F.3d 173, 183 (3d Cir. 2018)). Although reasonable suspicion is a lower standard than the

probable cause needed for an arrest, it requires "more than an inchoate and unparticularized suspicion or hunch of criminal activity." *See id.* (quoting *Wardlow*, 528 U.S. at 124). The government must show that "a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the] detention." *See United States v. McCants*, 952 F.3d 416, 422 (3d Cir. 2020) (alterations in original) (quoting *United States v. Brown*, 448 F.3d 239, 246–47 (3d Cir. 2006)). Given their "own experience and specialized training," an officer's reasonable suspicion determination is afforded "significant deference." *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) (quoting *United States v. Graves*, 877 F.3d 494, 499 (3d Cir. 2017)).

Looking at the totality of the circumstances here, the Court is satisfied that there was reasonable suspicion to seize Pennycooke. Several factors lead to this conclusion. First, Edwin Perez encountered Pennycooke late at night, in an area that had seen an increase in civil unrest in the recent days, and at a time when no one was supposed to be on the streets pursuant to a curfew order. Second, Pennycooke was geographically (about a hundred feet) and temporally (within a minute) proximate to the stolen ATM that Edwin Perez was investigating. And there were other consistencies with the radio call reporting the stolen ATM: there was what appeared to be a safe or ATM on a cart at that location, and there appeared to be only two men, standing together, in the vicinity. Third, after Edwin Perez questioned Pennycooke about the safe in the street, he observed Pennycooke move closer to his car as he was looking toward the safe, remove a heavy object from his waistband, and then toss it in the backseat of his car. Edwin Perez was confident—based on his seven years as a patrol officer—that the object was a gun. Though possession of a gun is not necessarily unlawful, Pennycooke's surreptitious attempt to dispose of the gun when confronted by police suggested that he did not have a license to possess it. *United*

7

*States v. Mosley*, No. 01-0664, 2002 WL 32351168, at *3 (E.D. Pa. Sept. 18, 2002) (Bartle, J.) (finding that the officers had probable cause to believe the defendant "possessed the gun unlawfully, in light of his attempt to hide it"). Taken together, it is clear that Edwin Perez had "a particularized and objective basis for suspecting criminal activity," to justify the investigatory stop.[8]

### B. There was probable cause to arrest Pennycooke.

Next, Pennycooke claims that even if the officers had reasonable suspicion to stop him, they did not have probable cause to arrest him. Docket No. 20-cr-0227, ECF No. 17, at 11–13. He maintains that the arrest occurred at the moment Edwin Perez grabbed and handcuffed him. *Id.* at 12; *see also* Docket No. 20-cr-0227, ECF No. 47, at 7. That was before Edwin Perez looked into the car and observed the firearm in the backseat, and therefore, Pennycooke argues that the officer lacked probable cause at the time of arrest. Docket No. 20-cr-0227, ECF No. 17, at 12. The Court disagrees.

An individual may be arrested in public and without a warrant, under the Fourth Amendment, "if the officer possesses probable cause to believe the person committed a felony."

---

[8] Pennycooke takes issue with relying on many of these factors to justify the seizure. However, his arguments are ultimately unconvincing. For example, he contends that Pennycooke's apparent violation of the curfew order is essentially irrelevant to the reasonable suspicion analysis. The officers had no interest in investigating whether Pennycooke and Collins were actually violating the curfew order, as their questions were specific to the ATM in the middle of the street. ECF No. 47, at 3. In addition, Pennycooke points out the unreliability of the call reporting the stolen ATM: it was unverified, it contained only vague details, and the defendants only partially matched the clothing descriptions in the call. *Id.* at 4–5. While it is perhaps arguable that neither of these factors—*on their own*—would have supported the seizure, that is not the relevant standard here. Rather, the Court must consider the *totality of the circumstances*, and whether these factors combined with those discussed above demonstrate a "particularized and objective basis for suspecting criminal activity." *Cf. United States v. Mathurin*, 561 F.3d 170, 174 (3d Cir. 2009) ("Though the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they 'must serve to eliminate a substantial portion of innocent travelers.'" (quoting *Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir. 1995))).

Furthermore, Pennycooke challenges Edwin Perez's testimony that he observed Pennycooke discard an object into his nearby car. *Id.* at 5–7. However, the Court has found Edwin Perez's testimony on that point to be credible.

*Torres*, 961 F.3d at 622. Distinguishing between a warrantless arrest (which requires probable cause) and an investigatory stop (which only requires reasonable suspicion) is often difficult. *See id.* The "touchstone" of the analysis is the "reasonableness of the intrusion." *Id.* (quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1192 (3d Cir. 1995)). In conducting this analysis, courts must take into consideration "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

Here, Pennycooke insists that the investigatory stop escalated into an arrest when the officers handcuffed him. Docket No. 20-cr-0227, ECF No. 47, at 7. But "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." *Torres*, 961 F.3d at 622 (alterations in original) (quoting *Baker*, 50 F.3d at 1193). Police officers may, in the course of an investigatory stop, "take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo," without converting the stop into an arrest. *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)); *see also Torres*, 961 F.3d at 622 (explaining that if the officer reasonably believes that the suspect is "armed and presently dangerous," then the officer may take the "necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm" (quoting *Terry*, 392 U.S. at 24)). Given the fact that Edwin Perez observed Pennycooke throw a gun into a nearby car, it was completely reasonable for him to handcuff Pennycooke, wait a few moments for a backup officer to arrive, and then place Pennycooke in the police vehicle for a short period of time to allow the officers to safely recover the gun and confirm that Pennycooke did not have a license to carry it. The officers' actions were

necessary to protect their personal safety and therefore did not turn the stop into an arrest.[9] To find otherwise would be unreasonable.[10]

### C. There was reasonable suspicion to seize Collins.

Turning to Collins's motion, the Court similarly finds that the officers' investigatory stop of him was not in violation of the Fourth Amendment. To repeat, a warrantless investigatory stop is permissible, under the Fourth Amendment, if there is reasonable suspicion that "criminal activity is afoot." *Lowe*, 791 F.3d at 430. The analysis begins with identifying the moment the defendant was seized. *Id.* Then, the court must determine whether—at that moment—there was reasonable suspicion, based on the totality of the circumstances, to justify the seizure. *Id.*

Here, there is little dispute that Collins, like Pennycooke, was seized when he complied with the officers' demands to show his hands. The question, however, is whether there was reasonable suspicion, at that time, to support his seizure. Many of the same factors that were relevant to the reasonable suspicion analysis for Pennycooke apply equally to Collins: the late hour of the encounter, the increase in civil unrest in the vicinity in recent days, the curfew order, the proximity (both geographically and temporally) to the reportedly stolen ATM, and the only individuals in the area were the two defendants standing together on the sidewalk. But the analysis does not end there. Prior to the seizure, Arcenio Perez observed Collins "blading" his body, as if trying to evade the officers' notice behind Pennycooke. Moments later, Edwin Perez

---

[9] Regardless, even at the moment when he was handcuffed, there was sufficient probable cause to arrest Pennycooke. *Mosley*, 2002 WL 32351168, at *3 (finding that the officers had probable cause to believe the defendant "possessed the gun unlawfully, in light of his attempt to hide it").

[10] Pennycooke also appears to challenge, in his supplemental brief, the warrantless search of his vehicle. ECF No. 47, at 7. However, that search was permissible as the gun was visible in plain view. *United States v. Galaviz*, 645 F.3d 347, 355–57 (6th Cir. 2011) (upholding the denial of a suppression motion by applying plain view doctrine to the recovery of gun from locked car because police officer was lawfully in a position to view the gun, the gun was in plain view and the incriminating nature was immediately apparent, and the officers had a lawful right of access to seize the gun).

reported that Pennycooke, who was standing next to Collins, threw a gun into the backseat of a nearby car. Though "mere association" with someone suspected of criminal activity "cannot *on its own* be a basis for reasonable suspicion," it may be considered with other factors that combine to create sufficient grounds for an investigatory stop. *See United States v. Coggins*, 986 F.2d 651, 655 (3d Cir. 1993). The combination of all of the above-mentioned factors created sufficient grounds for the investigatory stop of Collins.

**D. The Court will issue an order pursuant to the Due Process Protections Act.**

In addition to the suppression motion, Collins requested an order compelling the production of *Brady* materials. *See* Docket No. 20-cr-0228, ECF No. 19, at 13–21. *Brady v. Maryland*, 373 U.S. 83, 87 (1963), established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The *Brady* rule was later refined to require the disclosure of "materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Friedman*, 658 F.3d 342, 357 (3d Cir. 2011) (quoting *United States v. Milan*, 304 F.3d 273, 287 (3d Cir. 2002)).

Last year, Congress passed the Due Process Protections Act. *See* Due Process Protections Act, Pub. L. No. 116-182, 134 Stat. 894 (2020). That law amended Federal Rule of Criminal Procedure 5, which now requires that "[i]n all criminal proceedings . . . the judge shall issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and the possible consequences of violating such order under applicable law." FED. R. CRIM. P. 5(f)(1).

Collins does not allege prosecutorial misconduct in violation of *Brady*. Rather, he seeks a prophylactic order directing the government to disclose requested information. In response, the government notes that "it has complied with its discovery obligations to-date and is not aware of any *Brady* material in this case" but if it "becomes aware of any such *Brady* material, it will promptly produce it." Docket No. 20-cr-0228, ECF No. 20, at 14.

While there is no indication that the government has violated, or will violate, its *Brady* obligations, the Due Process Protections Act compels an order confirming the government's compliance with *Brady*. *See, e.g.*, *United States v. Hossain*, No. 19-cr-606, 2020 WL 6874910, at *6 (S.D.N.Y. Nov. 23, 2020) (issuing order under the Due Process Protections Act); *United States v. Ryan*, No. 20-65, 2021 WL 795980, at *2 (E.D. La. Mar. 2, 2021) (same). As the Court advised the parties on the record, the accompanying order again reminds the government of its obligation to timely disclose information favorable to the defense as to criminal liability on the charged offenses or mitigation of any punishment that may be imposed. Such favorable information includes information that may cast doubt on the credibility of government witnesses. Possible consequences for violating this order include exclusion of evidence, dismissal of charges, contempt proceedings, disciplinary referral, and any other relief authorized by law.

### E.  The remaining requests in Collins's motion are moot.

Collins also sought to suppress certain statements allegedly obtained in violation of his Fourth and Fifth Amendment rights and requested orders directing the government to identify any prior bad act evidence it intends to use at trial, to preserve all investigation rough notes and draft reports, and to provide an early production of *Jenks* material. These motions, however, are now moot.

First, the government represents that it will not introduce Collins's alleged statements in its case-in-chief. Docket No. 20-cr-0228, ECF No. 20, at 13. Second, the government avers that it is not aware of any prior bad act evidence that it intends to introduce at trial. If that changes, then the government will "promptly notify defense counsel." *Id.* at 13–14. Third, the government again claims that there are no rough notes of the reports that have been produced in this case, but if it "becomes aware of such notes and if they contain inconsistencies with the reports that were produced in discovery," then the government will produce them. *Id.* at 14. Finally, the government maintains that it has "already produced all discovery in its possession to-date, including the production of *Jencks* materials," and if it learns of additional material or new *Jencks* material, then that will be produced "at least five days before any hearing or trial where the witness testifies." *Id.* As such, the remaining requests in Collins's omnibus motion are moot.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Pennycooke's motion to suppress will be **DENIED**. Collins's omnibus pretrial motion will be **DENIED in part** and **GRANTED in part**, as described more fully above. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge